## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **LOGAN DYJAK,**<br>**#884839,**<br><br>                    **Plaintiff,**<br><br>**v.**<br><br>**TONYA PIEPHOFF,**<br>**ROD HOEVET,**<br>**JENNIFER GERLING,**<br>**SARAH KEHL,**<br>**DR. GAVALI,**<br>**SARAH BROWN-FOILES, and**<br>**MARY HENDRIX-HOLLOWAY,**[1]<br><br>                    **Defendants.** | **Case No. 18-cv-02003-SPM** |

## <u>MEMORANDUM AND ORDER</u>

**MCGLYNN, District Judge:**

Pending before the Court is a Motion for Summary Judgment (Doc. 83) filed by Defendants Piephoff, Hoevet, Gavali, Gerling, Hendrix-Holloway, Brown-Foiles, and Kehl. The Court heard oral arguments on the motion on June 1, 2022. For the reasons set forth below, the motion is granted in part and denied in part.

### BACKGROUND

Plaintiff Logan Dyjak is in the custody of the Illinois Department of Human Services ("IDHS"). He is currently housed at McFarland Mental Health Center ("McFarland") in Springfield, Illinois. Dyjak commenced this lawsuit pro se alleging that his constitutional rights were violated when certain privileges were reduced while housed at Alton Mental Health Center.

---

[1] The Clerk is **DIRECTED** to update the names of Defendants Sarah Johnson and Mary Hendrix to reflect their correct names as provided in the Answer to the Second Amended Complaint and Motion for Summary Judgment: Sarah Kehl and Mary Hendrix-Holloway. (*See* Doc. 34, 83).

Page 1 of 25

(Doc. 1, 10). After the Court recruited counsel to represent Dyjak, a Second Amended Complaint was filed by counsel. (Doc. 23). Dyjak claims that his constitutional rights were violated in 2018, when he was emergency transferred from Alton Mental Health Center ("Alton"), a medium security facility where Dyjak enjoyed highest level of facility provided privileges, to Chester Mental Health Center ("Chester"), a maximum security facility. Dyjak asserts he was transferred in retaliation for advocating for the civil rights of himself and other recipients of IDHS services by filing complaints and grievances. Additionally, proper procedures were not followed regarding his transfer, and Dyjak claims he was denied due process. Ultimately, Dyjak successfully appealed the decision to transfer him to the IDHS Secretary. He was later transferred from Chester to McFarland, a medium security facility. Dyjak is proceeding with the following claims:

> **Count 1:**     First and Fourteenth Amendment claim against Defendants Piephoff, Hoevet, Gerling, Kehl, Gavali, Brown-Foiles, and Hendrix-Holloway[2] for transferring Dyjak from a medium security facility to a maximum security facility in retaliation for filing grievances and complaints.

> **Count 2:**     Fourteenth Amendment claim against Defendants Piephoff, Hoevet, Gerling, Kehl, Gavali, Brown-Foiles, and Hendrix-Holloway for transferring Dyjak from a medium security facility to a maximum security facility without due process of law.

(*See* Doc. 24). On November 18, 2021, Defendants filed a Motion for Summary Judgment. (Doc. 83, 119). Dyjak filed a Response in Opposition. (Doc. 96). Defendants then filed a reply brief. (Doc. 102). Because of the lengthy factual record and complex legal issues, Dyjak filed a motion requesting that the Court hold oral arguments on the Motion for Summary Judgment. (Doc. 103). The Court granted the motion and arguments were heard on June 1, 2022. (Doc. 104).

---

[2] The Court notes that Hendrix-Holloway is not named as a defendant in Count 1 of the Second Amended Complaint. (Doc. 23, p. 10). Prior to this case being reassigned to the undersigned, Chief Judge Rosenstengel characterized Counts 1 and 2 as being brought against *all* Defendants. (Doc. 24). Defendants too have stated that Count 1 is brought against "Defendants." (Doc. 119, p. 1). Thus, the Court will continue to treat Count 1 as against all Defendants, Piephoff, Hoevet, Gerling, Johnson, Gavali, Brown-Foiles, and Hendrix-Holloway.

## RELEVANT FACTS AND ALLEGATIONS

Logan was committed to Alton Mental Health Center ("Alton") on February 22, 2013, when he was adjudicated guilty by reason of insanity on charges of first degree murder. (Doc. 119-10, p. 9; Doc. 84-13, p. 3). Dyjak remained at Alton until February 6, 2018, when he was transferred via emergency procedures to Chester Mental Health Facility ("Chester"). (Doc. 119-1, p. 49; Doc. 84-13, p. 3). At the time of Dyjak's transfer, his treatment team included: 1) Defendant Dr. Delsie Gavali, his treating psychiatrist; and 2) Defendant Sarah Kehl, his assigned social worker. (Doc. 119-3, p. 32, 58). Defendant Dr. Rod Hoevet was the Clinical Director, Defendant Tony Piephoff was the Hospital Administrator, Defendant Sarah Brown-Foiles was the Director of Social Work, and Defendant Mary Hendrix-Holloway was a Security Therapy Aid ("STA") assigned to Dyjak's unit. (Doc. 119-3, p. 14-15; Doc. 119-4, p. 3; Doc. 119-8, p. 2). Defendant Jennifer Gerling was a social worker and Dyjak had previously been assigned to her caseload. (Doc.119-3, p. 22). Prior to becoming the Director of Social Work, Dyjak was also on Defendant Sarah Brown-Foiles's caseload as well. (Doc. 119-6, p. 21).

During his time at Alton, Dyjak asserts that he filed "hundreds and hundreds of complaints" regarding various issues of his confinement, including insufficient diet, involuntary blood draws and medication without a court order, physical abuse, theft, and implementation of unwarranted restrictions. (Doc. 119-1, p. 38). He claims that he filed grievances and lodged complaints using the internal processes at Alton and by submitting complaints with outside entities. (*Id*. at p. 37-38). These entities included the Human Rights Authority ("HRA") and the Office of Inspector General. (*Id.* at p. 50, 106). Dyjak testified that he also assisted other recipients in advocating for their rights through filing complaints. (*Id.*). The extent of Defendants' knowledge regarding Dyjak's practice of lodging complaints is disputed.

Beginning in 2017, after being transferred to Unit A2, Dyjak began complaining to staff

Page 3 of 25

about another recipient also housed in the unit, KT.[3] (Doc. 119-1, 53-54; Doc. 119-2, p. 21; Doc. 119-5, p. 34, 39, 66; Doc. 119-6, p. 45; Doc. 119-7, p. 89, 155; Doc. 119-8, p. 22-23, 84, 223; Doc. 119-10, p. 4; Doc. 96-1). Dyjak testified that he frequently had unwanted interactions with KT. (Doc. 119-1, p. 54). Dyjak alleges that KT would follow Dyjak around the unit, try to grab Dyjak, expose himself to Dyjak, force his way into Dyjak's room, and take Dyjak's personal property. (*Id.*).

KT was admitted to Alton in October 2014. (Doc. 84-8, p. 243). He is non-verbal and suffers from dementia and cognitive impairment. (Doc. 119-2, p. 18; Doc. 84-4, p. 29; Doc. 119-5, p. 32; Doc. 119-7, p. 89; Doc. 119-8, p. 82, 243). KT has a recorded history of entering the rooms of other recipients, grabbing other recipients, taking the personal property of other recipients, urinating and defecating in public areas, exposing himself to other recipients, and was observed masturbating in the dayroom area. (Doc. 119-3, p. 85, 93-94; Doc. 119-7, p. 155; Doc. 84-8, p. 51, 246). Kehl testified that other recipients complained to her about KT. (Doc. 119-7, p. 155-56). Piephoff testified that "[i]t was common knowledge that [KT] wandered, and the majority of the patients closed and locked their door[s]." (Doc. 84-8, p. 83). KT's physician report dated July 27, 2017, records, "[KT] has been increasingly difficult to redirect from behaviors that may be harmful to himself or others." (Doc. 84-8, 242). In his social assessment written by Gerling dated October 3, 2017, she writes that KT "has become increasingly agitated and physically[sic] aggression (grabbing at others' arms and clothing and refusing to let go) this past year and presents with angry affect." (Doc. 119-3, p. 80-81; Doc. 84-8, p. 247). Gerling further notes that KT's problematic behavior caused retaliation on the part of other recipients and "resulted in some injuries to [KT] by his peers." (*Id.*).

---

[3] The Court will keep the identity of this individual anonymous and refer to him at "KT." The parties have been directed to redact this individual's name in publicly filed briefs and exhibits or, in the alternative, refer to him by these initials.

In response to his complaints about KT, Dyjak was advised that he could close and lock his room to prevent other recipients from accessing his room and personal belongings. (Doc. 119-1, p. 82; Doc. 84-2, p. 34; Doc. 119-6, p. 45; Doc. 119-7, p. 65; Doc. 84-8, p. 84). Recipients could request to have their rooms locked by staff, but they were not given keys. (*Id.*). Dyjak declined to lock his room because he would have to contact staff each time he wanted reenter his room. (Doc. 119-7, p. 65). Dyjak stated that he knew of another patient who "got into trouble" for requesting staff to unlock his door, and Dyjak "didn't want to get into a similar situation." (Doc. 119-1, p. 84). He also preferred for his room to remain unlocked so he could easily return his library books to his room before one of his treatment classes. (*Id.* at p. 83). Dyjak testified that he was not allowed to take library books to the class. (*Id.*). Other than the suggestion to lock his room, Dr. Gavali, Brown-Foiles, and Kehl testified that they were unaware of additional action that was taken by staff in response to Dyjak's complaints. (Doc. 84-2, p. 37; Doc. 119-6, p. 46; Doc. 119-7, p. 66).

Each day, community meetings are held in Unit A2, and recipients are encouraged to attend. (Doc. 84-4, p. 13). Recipients are allowed to conduct the meeting, and the group discusses the day's calendar and various activities going on within the facility and the unit. (*Id.*). Hendrix-Holloway testified that on January 10, 2018, Dyjak conducted the community meeting and made inappropriate comments about KT. (*Id.* at p. 30; Doc. 84-12, p. 49). Dyjak told other recipients to stay away from KT and said, "look at [KT], he has his hands on his dick." (*Id.*). When Hendrix-Holloway looked, KT did not have his hands on his genitals. She told Dyjak that he was being inappropriate and wrote a behavior note regarding the incident in his mental health records. (*Id.*). Hendrix-Holloway also immediately notified other staff members. (Doc. 84-4, p. 32-33).

Dyjak's version of events differs. According to Dyjak, he remembers one conversation with Hendrix-Holloway in which he complained about KT fondling his genitalia and staring at

him. (Doc. 119-1, p. 35). He testified to the following:

> [Hendrix-Holloway] stated that the individual wasn't masturbating, and
> then she looked over at the individual and saw that they were masturbating
> and got into a scuffle with the individual trying to remove their hand from
> their penis.

(*Id.* at p. 36). Dyjak stated that this interaction took place in early 2018 or sometime in 2017. (*Id.*).

A few days later, on January 12, 2018, Dr. Hoevet sent an email to staff, which included Gerling, Dr. Gavali, Kehl, and Piephoff. (Doc. 84-8, p. 223). In the email, Dr. Hoevet states that another psychologist, Dr. Olt, reported to Dr. Hoevet that Dyjak was concerned that KT "was an MRSA carrier," "going around grabbing/touching people," and "walks around with his genitalia exposed." (*Id.*; Doc. 119-1, p. 58). Dr. Olt also informed Dr. Hoevet that Dyjak expressed fear of retaliation by staff and that "a conversation with Jen in which he felt dismissed and belittled." (*Id.*). Dr. Hoevet wrote that he "know[s] quite a bit about what is going on with [KT]…I do not believe there is much, if any truth in what he has alleged, but by sending this to you all, I presume you will sort out the truth and address any needs." (*Id.*). Dr. Hoevet testified that he did not recall discussing Dyjak's concerns with Dr. Olt. (Doc. 119-5, p. 66). He was not aware whether KT was going around touching people and exposing his genitals. He was also not aware that Dyjak had a concern of retaliation or whether he took any action in response to his conversation with Dr. Olt. (*Id.* at p. 67). Dr. Hoevet testified that Dyjak had a "reputation for embellishing." (*Id.* at p. 68). Dr. Hoevet confirmed that KT was a MRSA carrier. (*Id.* at p. 67).

Gerling responded to Dr. Hoevet's email writing that she met with Dyjak after an STA reported that Dyjak had made public comments in front of other recipients labeling KT as a sexual predator and as infected with a contagious disease. (Doc. 119-3, p. 96). She wrote that Dyjak "does not accept any type of constructive feedback well and takes it as a personal attack." (Doc. 84-8, p. 223). Gerling continues that Dyjak expressed anger that "he was approached with the incident"

and "which I thought we had worked through by the end of the session, but obviously not…The team can discuss further reeducation." (*Id.*).

Gerling testified that following this session regarding Dyjak's public comments, she continued to have supportive sessions with Dyjak to work "through any issues that he brought to those sessions." (Doc. 119-3, p. 96). Dyjak testified that at a session with Gerling she told him that he "would be throwing it all away," if he continued to complain about KT. (Doc. 119-1, p. 49). Gerling testified that she does not recall making that statement but that she would not tell a recipient not to make complaints. (Doc. 119-3, p. 29).

On the morning of February 6, 2018, KT tried to enter Dyjak's room three times. (Doc. 96-2).[4] Security video footage shows KT approaching Dyjak's room. Dyjak, who was sitting at a nearby table in the common area, stands up and walks towards his room. He stands nearby watching KT. As KT enters Dyjak's room, Dyjak walks up to KT and pulls him out of the room by his shirt. KT again tries to enter Dyjak's room, and Dyjak pulls on KT's shirt a second time. This time KT falls to the ground and rolls. (*Id.*; Doc. 119-1, p. 79). Dyjak then walks away and sits back down at the nearby table. After getting up off the floor, KT approaches Dyjak's room for a third time. Dyjak walks up to KT, and a staff member intervenes and leads KT away. (*Id.*). Defendants Piephoff, Dr. Hoevet, and Kehl could not recall KT suffering from any injuries. (Doc. 84-8, p. 33; Doc. 119-5, p. 37; Doc. 119-7, p. 76).

Later that morning, a staff note entered at 11:00 a.m. in Dyjak's mental health notes, records that Dyjak's movement privileges were restricted to the housing unit for aggressive behavior. (Doc. 119-7, p. 56-57; Doc. 84-12, p. 52). At some point that morning, Dyjak requested to place a call with the Human Rights Authority, and he was allowed to make the call. (Doc. 84-

---

[4] The security video footage, Exhibit 2 to Doc. 96, was manually filed by Dyjak with the Court. (Doc. 98, 116).

12, p. 52). That same day, a request for an emergency transfer of Dyjak to Chester was sent to a statewide panel for approval. (Doc. 119-5, p. 73; Doc. 84-8, p. 35). According to Alton procedure, in order to transfer a recipient to Chester 1) the treatment team completes and submits a Request for Transfer to the medical director or designee; 2) the medical director or designee then presents the Request for Transfer to the statewide Director of Forensic Services; 3) if approved, the treatment team would present their case to a statewide panel via telephone conference. (Doc. 84-11; Doc. 84-8, p. 35).

The facts surrounding who initiated the request for an emergency transfer are unclear. Kehl testified that she, Dr. Hoevet, and Piephoff watched the video footage of the incident between Dyjak and KT. (Doc. 119-7, p. 34-35). After viewing the video, "administration felt that the incident warranted an emergency transfer to a more secure setting and directed [Kehl] to complete a transfer packet." (*Id.* at p. 36). Kehl testified that the persons involved in the decision to transfer Dyjak were herself, Dr. Hoevet, and Piephoff. (*Id.* at p. 40). She stated that the recommendation to transfer Dyjak would not "have left the building if the clinical director [Dr. Hoevet] and hospital administrator [Piephoff] didn't agree to it." (*Id.* at p. 41).

Piephoff testified that emergency transfers are initiated by the treatment team. She stated that on February 6, 2018, Dr. Hoevet informed her of the incident involving Dyjak and KT and that an emergency transfer of Dyjak was being requested. (Doc. 84-8, p. 34). She agreed that the request should be "brought to the panel's attention." (*Id.* at p. 35). Piephoff does not recall viewing the video footage that day. (*Id.* at p. 36).

Dr. Gavali stated that the persons involved in the decision to transfer Dyjak were Gerling, Dr. Hoevet, and his treatment team, which included Kehl and herself. (Doc. 84-2, p. 27; Doc. 119-3, p. 32).

Dr. Hoevet testified that emergency transfer proceedings were initiated because Dyjak's

Page 8 of 25

treatment team "wanted to put together a packet, a recommendation to transfer [Dyjak] to a maximum security facility, to Chester Mental Health Center. They did so." (Doc. 119-5, 37-38). He stated that "I have no role in the process other than being the liaison to send it along." (*Id.* at p. 76). In an email sent to the statewide panel from Dr. Hoevet on February 6, 2018, in which he attached the emergency transfer request packet, he writes that he would "like to provide some other data." (Doc. 84-8, p. 182). He writes in the email that he is "suspicious" of Dyjak's diagnosis of schizoaffective disorder and believes Dyjak "easily meets the criteria for Narcissistic Personality Disorder." (*Id.*). He continues, "myself, others in leadership and the treatment team have long suspected that he is responsible for other, similar instances of aggression, but we have not been able to catch him in it." (*Id.*).

The statewide panel approved the transfer, and Dyjak was provided a Notice of Transfer. (Doc. 119-3, p. 37). Dyjak was transferred to Chester approximately two to three hours after the incident with KT. (Doc. 84, p. 7; Doc. 96, p. 7-8).

Dyjak objected to his transfer. On March 1, 2018, the Utilization Review Committee ("UR Committee"), composed of Defendants Dr. Hoevet and Brown-Foiles, as well as Dotty Blank and Elizabeth McIntosh, held a hearing on the objection and reviewed the transfer. The UR Committee heard testimony from Dyjak, Dr. Gavali, and Kehl. Following the hearing, the UR Committee recommended that the transfer be upheld and sent their report and recommendation to Piephoff, who accepted the recommendation. (Doc. 84-8, p. 99-100; Doc. 84-9; Doc. 84-13, p. 6).

Dyjak then appealed to the decision to the Secretary of Human Services ("Secretary"). On June 8, 2018, the Secretary determined that the record did not contain substantial evidence to show that the transfer was appropriate. (Doc. 84-13). The Secretary pointed out that "the record lacks any documentary evidence to support" Kehl's and Gavali's testimony or the findings "about [Dyjak's] treatment needs, clinical diagnosis, and previous incidents of misbehavior." (*Id.* at p.

Page 9 of 25

14). The Secretary granted Dyjak's appeal, and he was transferred to McFarland, a medium security facility in August 2018.

SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012) (quoting FED. R. CIV. P. 56(a)). *Accord Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enterpr., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014).

In assessing a summary judgment motion, a district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Donahoe*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Cmty. Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014).

ANALYSIS

## I. DEFENDANT HENDRIX-HOLLOWAY

Defendants first argue that Defendant Hendrix-Holloway should be granted summary judgment as to all counts because she had no direct personal involvement in Dyjak's transfer to Chester. (Doc. 119, p. 13).

Page 10 of 25

In response, Dyjak points to the progress note written by Hendrix-Holloway on January 10, 2018, as evidence of her involvement. He asserts that the note falsely portrays him as disparaging KT at a community meeting. (Doc. 96, p. 21). Dyjak further claims that this note led to the meeting with Gerling in which she threatened Dyjak he would be "throwing it all way" if he continued to complain. The note is also the only documentation created before the incident with KT on February 6 that Defendants can use to justify the transfer. (*Id.*).

The Court agrees that Dyjak has not presented sufficient evidence for a jury to reasonably conclude the Hendrix-Holloway was personally involved in the constitutional deprivation at issue – an emergency transfer to a maximum security facility. *See Gentry v. Duckworth,* 65 F 3d. 555, 651 (7th Cir. 1995) ("[t]o recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right"). At the time of the alleged events, Hendrix-Holloway was employed as a security therapy aide at Alton. Her duties included monitoring, reporting, and observing the recipient's behavior. (Doc. 119, p. 4; Doc. 96, p. 4). Hendrix-Holloway testified that she was not involved in the transfer process, she was not present at the facility the day Dyjak was transferred, and she did not participate in any way with Dyjak's appeal. (Doc. 119-4, p. 8). Assuming Dyjak's allegations are true and Hendrix-Holloway fabricated the progress note that was used as evidence to support his transfer, the note still does not speak to her knowledge of or involvement in the transfer itself. *Syzmanski v. Rite-Way Lawn Maintenance Co., Inc.,* 231 F. 3d 360, 364 (7th Cir. 2000) (a party cannot "survive summary judgment with merely a scintilla of evidence supporting its position"). It is not reasonable to infer, based on this single progress note, that Hendrix-Holloway intended for the note to lead to Dyjak's transfer. Because there is no evidence of personal involvement, summary judgment shall be granted to Hendrix-Holloway on all counts.

## II. FIRST AMENDMENT RETALIATION

In order to prevail on a claim of retaliation, a plaintiff must show that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." *Hawkins v. Mitchell*, 756 F.3d 983, 996 (7th Cir. 2014) (citations omitted). Thus, the plaintiff must set forth a chronology of events and show that his First Amendment activities were a motivating factor for an adverse action. *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000). In this context, an adverse action is one that would chill or deter a person of ordinary firmness from exercising a First Amendment right. *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982). Once the plaintiff meets his burden, the burden shifts to Defendants to show that in the absence of the protected conduct the harm would have occurred anyway. *Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011).

Defendants move for summary judgment on two grounds. First, they argue that Dyjak has failed to show that he suffered a deprivation that would likely deter First Amendment activity in the future. Second, Defendants contend that Dyjak has failed to demonstrate that the First Amendment activity was the reason that any Defendant decided to act and transfer him. (Doc. 119, p. 14). Specifically, Defendants argue that they cannot be liable because they were unaware of any grievances or complaints submitted by Dyjak. (*Id.* at p. 16).

### A. Deprivation Likely to Deter Free Speech

In *Higgason v. Farley,* the Seventh Circuit held that "[i]f a prisoner is transferred for exercising his own right of access to the courts, or for assisting others in exercising their right of access to the courts, he has a claim under §1983." 83 F. 3d 807, 810 (7th Cir. 1996). Since then, the Seventh Circuit has clarified that this previous statement does "not support a blanket rule that *any* transfer motivated by the plaintiff's First Amendment activity is sufficiently adverse to

Page 12 of 25

constitute retaliation." *Holleman v. Zatecky,* 951 F. 3d 873, 9881 (7th Cir. 2020). Courts must still assess whether the transfer is "likely to deter a person of ordinary firmness from continuing to engage in protective activity." *Id.* (internal quotations and citations omitted).

Here, Dyjak alleges he was transferred from a medium security facility to a maximum security facility and was confined there for six months. At Chester, he lost the privilege to move around the buildings and grounds and the right to make unsupervised phone calls. Dyjak was subjected to "substantially restricted movement, specialized physical plant and monitoring, and nearly continuous observation." (Doc. 96, p. 13) (citation omitted). Because of the improper transfer, Dyjak alleges he lost all of his medical prescriptions and dietary orders, which resulted in rapid weight loss, severe hypertension, severe constipation and associated bleeding, dry skin, and chapped lips. (*Id.*). Much of his personal property was lost or damaged.

The disruption Dyjak experienced when moving to Chester is "inherent in a transfer to a different facility" and "does not by itself make the transfer adverse." *Holleman,* 951 F. 3d at 882. However, because Dyjak was transferred to a more restrictive environment, there are sufficient facts for a reasonable jury to determine that a transfer from Alton to Chester would deter a person of ordinary firmness from future First Amendment activity. *See Douglas v. Reeves,* 964 F. 3 643, 647 (7th Cir. 2020) ("[w]hether retaliatory conduct is sufficiently severe to deter is generally a question of fact"). Defendants are not entitled to summary judgment on this element of the retaliation claim.

### B.  Protected Speech as a Motivating Factor

Defendants contend that Dyjak has not offered any proof outside of his own opinion that he was retaliated against. They assert that he was emergency transferred because the safety of others were imminently imperiled by Dyjak's actions, when he grabbed KT, a vulnerable recipient, by his shirt causing KT to fall to the ground. Prior to making physical contact with KT, Dyjak

Page 13  of  25

displayed premeditative behavior by watching and waiting for KT. Further, Dyjak failed to ask staff for help or lock his door in order to avoid any physical altercation. Defendants assert that Dyjak was transferred not in retaliation but because the staff believed this was the best option due to the imminent risk Dyjak posed to others and himself. (*Id.* at p. 16).

Viewing the record in the light most favorable to Dyjak, a rational trier of fact could find that Dyjak's repeated filing of grievances and lodging of complaints was at least a motivating factor in Defendants' decision to transfer him to a maximum security facility. The arguments that Defendants did not have knowledge that Dyjak filed grievances or complained to staff is not supported by the record. Piephoff testified that she was aware of complaints made by Dyjak to the Clinical Nurse Manager. (Doc. 84-8, p. 31). She remembered specifically a complaint made regarding dietary and a complaint Dyjak submitted to the HRA regarding the denial of a book. (*Id.* at 31, 131). Gerling testified that prior to Dyjak's transfer she had a session with him in which he raised complaints regarding KT. (Doc. 119-3, p. 94-95). Although she was unsure of the timing, Brown-Foiles testified that at some point she "had heard [Dyjak] had made some complaints." (Doc. 119-6, p. 45). Brown-Foiles also emailed other staff in 2015 and 2016 regarding complaints made by Dyjak. (Doc. 112-2, p. 2; Doc. 119-6, p. 65). Kehl testified that she did not recall anyone approaching her regarding a complaint lodged by Dyjak, but she also confirmed that during the UR Committee hearing she stated that she had in fact heard that Dyjak had complained about KT. (Doc. 119-7, p. 22, 89). Dr. Gavali stated that she knew Dyjak complained about KT to security therapists. (Doc. 84-2, p. 21). Piephoff, Gavali, Gerling, and Kehl were all recipients of an email sent by Dr. Hoevet on January 12, 2018, regarding complaints Dyjak made concerning KT. (Doc. 119-5, p. 66-67). And most notably, Dr. Hoevet testified that Dyjak had a reputation for making complaints and was "known to feel slighted at lot." (Doc. 119-5, p. 116, 120). Even his August 24, 2017, treatment plan notes that Dyjak has "frequent requests for medication of hospital policies

Page 14 of 25

and procedures." (Doc. 112, p. 3). Based on this evidence, a jury could conclude that Defendants were aware that Dyjak filed grievances and lodged complaints.

There is also evidence from which a jury could infer that Dyjak's repeated complaints motivated Defendants to transfer him. *See Kidwell v. Eisenhauer,* 679 F. 3d 957, 966 (7th Cir. 2012) (stating that a plaintiff may show retaliation by use of circumstantial evidence). According to the record, there were members of staff, including Defendants, who considered Dyjak to be a difficult patient. (Doc. 119-7, p. 159; Doc. 84-2, p. 10-11; Doc. 119-5, p. 112-116). Dr. Hoevet describes Dyjak as manipulative and someone "able to manufacture stories to vindicate himself." (Doc. 119-5, p. 27; Doc. 84-2, p. 113). He had a reputation for filing complaints, and it appears that complaints submitted internally at Alton and to outside agencies caused additional work for staff, including written reports, attending additional meetings, conducting or submitting to investigations, and making policy changes. (Doc. 84-8, p. 25-27; Doc. 119-5, p. 22-23, 117). Dr. Hoevet expressed dread in having to "deal with HRA again," after Dyjak submitted a complaint regarding the denial of a book request in September 2017. (Doc. 119-5, p. 112, 117). Dyjak testified that Gerling threatened that he "would be throwing it all away" if he did not stop complaining. (Doc. 119-1, p. 46, 48). Additionally, Dyjak call the HRA shortly just hours before he was transferred to Chester on February 6, 2018. (Doc. 119-7, p. 57). Although disputed, the evidence is more than sufficient to create an issue of fact regarding motive.

Because Dyjak has made this showing, the burden shifts to Defendants "to rebut the casual inference raised by the plaintiff's evidence." *Kidwell,* 679 F. 3d at 965. They have failed to do so. Defendants contend that Dyjak was transferred because of the imminent risk he posed to himself and others. There is, however, evidence in the record to the contrary. Dyjak did not have a documented history of violence or aggression during his time at Alton. (Doc. 119-3, p. 29, 69-70; Doc. 84-13, p. 14). In his August 24, 2017 treatment plan filed with the state criminal court, it was

Page 15 of 25

recorded that Dyjak "has not exhibited symptoms of aggression or delusion since his hospitalization," in 2012. (Doc. 96, p. 9; Doc. 112, p. 3). In the most recent progress report dated January 12, 2018, it was documented that Dyjak had "no significant infractions of facilities rules." (Doc. 119-3, p. 69). Even though the UR Committee cited to a "history of violence against others," Defendants could not name any specific instance of violent or physically aggressive behavior from Dyjak while at Alton. (Doc. 96, p. 9; Doc. 84-2, p. 35; Doc. 119-3, p. 87; Doc. 119-7, p. 117; Doc. 84-9, p. 1). Dr. Hoevet testified that he did not believe Dyjak "was an imminent risk to [KT] before the incident occurred." (Doc. 119-5, p. 97). The UR Committee also noted that Dyjak's treatment plans "have attempted numerous approaches, over long periods of time, to redirect his fixations." (Doc. 84-9, p. 2). But recommending to Dyjak to lock his door seems to be the only treatment intervention offered. (Doc. 84-2, p. 18-19; Doc. 119-5, p. 45-46; Doc. 119-6, p. 61; Doc. 119-7, p. 65-66).

Additionally, Defendants description of what occurred between Dyjak and KT on February 6, 2018, is arguable. Defendants describe Dyjak's conduct that day as premeditated and that Dyjak threw KT to the ground. (Doc. 84-9, p. 1). Dyjak argues that what Defendants call premeditation was in fact him waiting for KT to enter his room and hoping staff would respond before he would have to stop KT himself. (Doc. 119-1, p. 78). He also states that when he pulled on KT's shirt, KT "lost his footing and fell to the ground." (*Id.* at p. 79). After reviewing the video footage, the Secretary of IDHS determined that the record lacked evidence to support the UR Committee's findings that an emergency transfer was necessary to ensure the safety of and prevent imminent harm to Dyjak and others. (Doc. 84-13).

It is also significant that KT had a history of "harmful" and "aggressive" behavior towards other recipients. (Doc. 84-8, p. 242-246). Additionally, there are two incidents where KT was physically harmed by other recipients that did not result in the transfer of either KT or the

aggressor. (Doc. 119-3, p. 90-91; Doc. 84-8, p. 124; Doc. 119-1, p. 140). The evidence provided is more than sufficient for a fact finder to infer that Defendants' reasons for transferring Dyjak were pretextual and would not have occurred in the absence of his First Amendment activities.

Thus, there is an issue of fact regarding whether Defendants Piephoff, Hoevet, Gerling, Kehl, Gavali, and Brown-Foiles transferred Dyjak in retaliation for filing grievances and complaints.

### c. Qualified Immunity

"The doctrine of qualified immunity shields public officials who perform discretionary duties from liability and protects those 'who act in ways they reasonably believe to be lawful.'" *Lieberman v. Budz,* No. 03 C 2009, 2009 WL 1437609, at *8 (N.D. Ill. May 20, 2009) (quoting *Wheeler v. Lawson,* 539 F. 3d 629, 639 (7th Cir. 2008). To determine whether an official is entitled to qualified immunity, the Court must assess (1) whether a constitutional right would have been violated on the facts alleged, and (2) whether the right alleged to have been violated was clearly established. *Surita v. Hyde,* 665 F. 3d 860, 868 (7th Cir. 2011).

 Defendants claim that they are entitled to qualified immunity. (Doc. 119, p. 22). They argue that under the facts asserted, they could not have known that they might be liable since they were trying to alleviate a safety and security concern presented by Dyjak's behavior, which created an imminent risk to himself and other recipients. Defendants also point out that they did not harm Dyjak by transferring him to Chester.

As stated above, there is a question of fact as to whether Defendants Piephoff, Hoevet, Gerling, Kehl, Gavali, and Brown-Foiles retaliated against Dyjak by transferring him in retaliation for filing grievances and complaints. Thus, the focus of the Court's inquiry is whether his First Amendment right was clearly established at the time.

The Seventh Circuit has recognized that "[t]he federal courts have long recognized a

prisoner's right to seek administrative or judicial remedy of conditions of confinement, as well as the right to be free from retaliation for exercising this right." *Babcock v. White,* 102 F. 3d 267 (7th Cir. 1996) (internal citations omitted). "The First Amendment protects against retaliation even if the retaliatory action itself does not amount to an independent constitutional violation." *Holleman v. Zatecky,* 951 F. 3d 873, 877 (7th Cir. 2020). The Seventh Circuit has repeatedly held that"[c]onduct that does not independently violate the Constitution can form the basis for a retaliation claim, if that conduct is done with an improper, retaliatory motive." *Hoskins v. Lenear,* 395 F. 3d 372, 375 (7th Cir. 2005). *See also Bridges v. Gilbert,* 557 F. 3d 541, 552 (7th Cir. 2009); *Howland v. Kilquist,* 833 F.2d 639, 644 (7th Cir. 1987) ("an act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for different reasons, would have been proper."). Thus, Defendants "would have been on notice that *any* retaliation, whatever its shape, could give rise to liability." *Babcock,* 102 F. 3d at 276. Accordingly, Defendants are not entitled to qualified immunity to the extent Dyjak is claiming that he was retaliated against for lodging complaints and advocating on behalf of himself, and summary judgment regarding Count 1 is denied in part as to Defendants Piephoff, Hoevet, Gerling, Kehl, Gavali, and Brown-Foiles.

To the extent Dyjak is claiming he was retaliated against for advocating for others, this right has not been clearly established. *See Shaw v. Murphy,* 532 U.S. 223, 232 (2001) (holding that inmate does not "possess a special First Amendment right to provide legal assistance to fellow inmates"); *Beese v. Todd,* 35 F. App'x 241, 244 (7th Cir. 2002) (stating that argument that inmate has right to provide legal assistance to inmates "lacks a basis in law"); *But see Higgason,* 83 F. 3d at 810 (recognizing the plaintiff had a claim if was transferred for "exercising his own right of access to the courts, or for assisting others in exercising their right of access to the courts"); *Harris v. Walls,* 604 F. App'x 518, 521 (7th Cir. Mar. 20, 2015) (plaintiff may have a First Amendment

right to assist other inmates in filing truthful grievances). Therefore, Defendants have qualified immunity from suit based on the claim that they transferred Dyjak for advocating for fellow recipients of IDHS services, and summary judgment is granted in part as to Count 1.

## II. Fourteenth Amendment Due Process Claim

Defendants argue that they are entitled to summary judgment because the transfer from Alton to Chester did not impose an atypical and significant depravation on Dyjak. (Doc. 119, p. 20) (citing *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). Defendants assert that the conditions between Alton and Chester are not significantly different. With the exception of his property, Dyjak's medicine and dietary issues were addressed, and he received most of his medical prescriptions and supplements while at Chester. Defendants point out that Dyjak remained at Chester for only six months before being transferred back to a medium security facility. While Dyjak claims he never received all of his personal property, he has a case pending with the Illinois Court of Claims regarding the missing property issue. Thus, there was no liberty interest that required due process prior to transfer.

In response, Dyjak argues that Defendants have misstated his claim and the proper standard to assess a due process violation. Citing the Supreme Court case *Youngberg v. Romeo,* 457 U.S. 307 (1982), he argues that, as a civil detainee, he has a clearly established "substantive due process liberty interest in 'reasonably nonrestrictive confinement conditions." (Doc. 96, p. 17, 21) (citing *Houghton v. South,* 965 F. 2d 1532, 1535 (9th Cir. 1992). He asserts that due process is violated where the imposed restriction is "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg,* 457 U.S. at 323. Dyjak contends that there is ample evidence that Defendants did not exercise professional judgment in their decision to transfer him.

Defendants filed a reply brief and does not dispute Dyjak's characterization of his claim.

Defendants argue that even applying the standard in *Youngberg,* summary judgment should still be granted in their favor. (Doc. 102, p. 4). Defendants point out that the Supreme Court in *Youngberg* stated that "courts must show deference to the judgment exercised by a qualified professional." *Youngberg,* 457 U.S. at 322-323. It would be inappropriate to find a question of fact just because a jury could come to a different conclusion than a train professional. Defendants argue that the Court should find that deference should be given to the professionals' findings regarding the best treatment for the patients within their mental health facilities. It is not for the jury to determine if their decisions were appropriate.

The Second Amended Complaint took issue with the procedures provided to Dyjak prior to his transfer and during his appeal.[5] In the response to the motion for summary judgment, however, Dyjak only cites to a substantive due process right and argues that as a civil detainee he was entitled to "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." (Doc. 96, p. 18) (citing *Youngberg,* 457 U.S. at 318). The Court asked Plaintiff's Counsel at the hearing on the motion for summary judgment to clarify whether Dyjak was bringing a procedural or substantive due process claim pursuant to the Fourteenth Amendment, and Counsel stated that both claims have been pled. Defense Counsel did not dispute this assertion and agreed that as to a substantive due process claim the standard is whether professional judgment was exercised as stated in *Youngberg*. Therefore, the Court will address Dyjak's Fourteenth Amendment claim as asserting violations of both substantive and

---

[5] In the Second Amended Complaint, Dyjak argues that Defendants violated his right to due process by 1) providing or using falsified medical and disciplinary records and providing or accepting false testimony in connection with his transfer; 2) not providing him an in-person hearing before being transferred; 3) not giving him twenty-four hours' notice before being transferred; 4) not allowing him to call witnesses or present physical or documentary evidence before being transferred; and 5) transferring him without support of evidence. (Doc. 23, p. 11). Furthermore, he was not given fourteen days' notice and a reason for the emergency transfer as required by Illinois law. The UR Committee who reviewed Dyjak's objection to the transfer was not impartial and failed to provide Dyjak or his counsel a copy of the UR Committee's findings of fact, conclusions, and recommendations as required by regulations. (*Id.*).

procedural due process.[6]

Because Dyjak has been adjudicated NGRI and not convicted, the Court agrees with the parties that Dyjak's assertion that the transfer to him to a maximum security facility was an unconstitutionally restraint on his liberty is governed by the Fourteenth Amendment. *See Dyjak v. Harper,* No. 18-cv-1011-MAB, 2022 WL 594861, at *9 (S.D. Ill. Feb. 28, 2022) ("it is well-established that claims brought by civilly committed detainees and other pretrial detainees challenging their conditions of confinement are governed by the Fourteenth Amendment's Due Process Clause") (citations omitted); *Nadzhafaliyev v. Hardy,* 2020 WL 7027578, at *4 (N.D. Ill. Nov. 30, 2020) (noting that the Supreme Court and the Seventh Circuit have not "directly addressed whether it is the Eighth or Fourteenth Amendment that is relevant" in cases involving a plaintiff who is adjudicated NGRI and concluding that the Fourteenth Amendment governs the plaintiff's Section 1983 claim). *See also Jones v. United States,* 463 U.S. 354, 368 (1983) ("[t]he purpose of commitment following an insanity acquittal, like that of civil commitment, is to treat the individual's mental illness and protect him and society from his potential dangerousness"). As stated by the Supreme Court in *Youngberg,* under the Fourteenth Amendment, institutionalized individuals in state custody have a constitutionally protected interest in "conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these conditions." *Youngberg,* 457 U.S. at 324. The Supreme Court further stated that "[l]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Id.* at 316 (quoting *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 18 (1979)). This right, however, is not absolute. "In operating

---

[6] Dyjak's motion for leave to file notice of supplemental authorities is **DENIED.** (Doc. 115). Defendants filed a response stating they do not dispute that the Prison Litigation Act ("PLRA") is not applicable to this case. (Doc. 116). Furthermore, the Court already determined that because Dyjak was adjudicated not guilty by reason of insanity, he was not a prisoner as defined under 28 U.S.C. § 1915. (Doc. 10, p. 1-2). No additional authority is needed.

[a mental health institution], there are occasions in which it is necessary for the State to restrain the movement of residents…" *Id.* at 320. Thus, treatment decisions by qualified professionals are given deference. *Id.* at 322. The due process clause is violated where the imposed restriction "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at p. 323. That being said, the motive for a transfer, whether security or treatment, "is irrelevant so long as the defendants did not confine [the individual] in a location that fell below standards typical of incarceration." *Moore v. Monahan,* 428 F. App'x 626, 630 (7th Cir. Apr. 13, 2022) (finding that a claim of unconstitutional conditions of confinement brought by an individual in the custody of IDHS failed as a matter of law).

Regarding the more restrictive conditions at Chester, as discussed above, Dyjak claims he lost the privilege to move around the buildings or grounds and the right to make unsupervised phone calls. (Doc. 96, p. 13). He was also subjected to 24 hour illumination. Dyjak cites to the IDHS manual stating that he experienced "substantially restricted movement, specialized physical plant and monitoring, and nearly continuous observation." (*Id.*). Dyjak testified that his dietary and prescriptions orders were canceled upon transfer, and he lost property that was never returned to him due to the improper transfer. (Doc. 119-1, p. 130). He asserts that the move caused him emotional distress, severe constipation and associated bleeding, dry skin, and chapped lips. (Doc. 96, p. 13).

Based on the evidence presented, the Court finds there is no issue of material fact regarding whether Dyjak's liberty interest was violated by his transfer to a maximum security facility. *See Youngberg,* 457 U.S. at 320 (the question "is not simply whether a liberty interest has been infringed but whether the extent or nature of the restraint…is such as to violate due process"). The Court first notes there is nothing in the record supporting the allegation that Dyjak was subject to

24 hour illumination. *See* FED. R. CIV. P. 56(c). Furthermore, all the other conditions that Dyjak was subjected to at Chester could have also occurred at Alton. At Alton, staff could implement one to one observation, which was explained as "when one staff member is assigned a patient to observe continuously." (Doc. 119-3, p. 72). Staff could also increase and decrease privileges and limit the movement of a recipient. (Doc. 119-7, p. 57). In fact, prior to his transfer, Dyjak was demoted to "unit privilege" meaning he was restricted to remaining in the housing unit. (*Id.*). Recipients housed at Alton could also have their rights restricted by being placed in seclusion, being administered emergency medication, the use of restraints, and having their ability to communicate with those outside the facility through mail or telephone restricted. (*Id.* at p. 51-52; Doc. 119-5, p. 63; Doc. 119-1, p. 122). Dyjak testified that at Chester the "diet was deficient," but he also complained of insufficient diet while at Alton. (Doc. 119-1, p. 37, 130). He confirmed that his dietary issues were eventually addressed, and he received all of his prescriptions, except for fish oil. (*Id.*). Accordingly, there is no evidence that the transfer caused him to be housed in conditions that were substantially worse than those imposed at Alton. *See Allision v. Snyder,* 332 F. 3d 1076, 1079 (7th Cir. 2003) ("[p]laintiffs do not assert that their situation is worse in any material way than the situation in which ordinary pretrial detainees find themselves"). *See also Levi v. Thomas,* 429 F. App'x 611, 612-613 (7th Cir. July 20, 2011) ("[d]isciplinary measures that do not substantially worsen the conditions of confinement of a lawfully confined person are not actionable under the due process clause ... and this regardless of whether the confinement is criminal or civil." (quoting *Miller v. Dobier,* 634 F. 3d 412, 414–15 (7th Cir. 2011)); *Parker v. Chester Mental Health Center,* 120 F. App'x 627, 629 (7th Cir. Dec. 1, 2004) (noting that the plaintiff failed to allege that the facilities at Chester were dissimilar in any relevant respect to other facilities); *Allison v. Snyder,* 332 F. 3d 1076, 1079 (7th Cir. 2003) (civil committees may be placed in prisons and covered by the usual institutional rules (citing *Bell v. Wolfish,* 441 U.S. 520 (1979))).

Page 23 of 25

Therefore, no juror could conclude that the transfer to a maximum security facility was an unconstitutional restraint on his liberty.

Because Dyjak has not demonstrated an issue of fact regarding the deprivation of a protected liberty interest, his procedural due process claim also cannot survive summary judgment. *See White v. Scott,* 849 F. App'x 606, 608 (7th Cir. June 14, 2021) ("[o]fficials do not violate a civil detainee's right to due process unless they deprive the detainee of a liberty interest"); *Miller v. Dobier,* 634 F. 3d 412, 415 (7th Cir. 2011). *See also Dyjak v. Wilkerson,* 2020 WL 6785077, at *2 (C.D. Ill. Nov. 18, 2020) ("a detainee in IDHS custody does not have a constitutional right o the housing of his choice").

Accordingly, summary judgment on Count 2 is granted as to Defendants Piephoff, Hoevet, Gavali, Gerling, Brown-Foiles, and Kehl.

### DISPOSITION

For the reasons stated above, the Court **GRANTS in part** and **DENIES in part** the motion for summary judgment filed by Defendants. (Doc. 83). The motion is granted as to Count 1 against Defendant Hendrix-Holloway and Count 2 against Defendants Piephoff, Hoevet, Gerling, Kehl, Gavali, Brown-Foiles, and Hendrix-Holloway. All claims against Hendrix-Holloway are **DISMISSED with prejudice.** The Clerk of Court shall terminate her as a defendant and enter judgment in her favor at the conclusion of the entire action.

Furthermore, Defendants Piephoff, Hoevet, Gerling, Kehl, Gavali, and Brown-Foiles are entitled to qualified immunity regarding Plaintiff Dyjak's claim that he was retaliated against for advocating on behalf of other IDHS recipients. Thus, summary judgment is granted as to this part of the claim in Count 1.

This action will proceed on the following count:

**Count 1:**     First Amendment claim against Piephoff, Hoevet, Gerling, Kehl,

Gavali, and Brown-Foiles for transferring Dyjak from a medium security facility to a maximum security facility in retaliation for filing grievances and complaints *on behalf of himself*.

A status conference will be set at a later date to set firm dates for a final pretrial conference and jury trial. In the meantime, the parties are encouraged to discuss whether a settlement conference would be beneficial and, if so, request a referral to a magistrate judge for that purpose.

The motion for leave to file notice of supplemental authorities filed by Dyjak is **DENIED.** (Doc. 115).

The Clerk is **DIRECTED** to update the docket in accordance with footnote 1.

**IT IS SO ORDERED.**

**DATED: September 30, 2022**

 *s/Stephen P. McGlynn*
**STEPHEN P. MCGLYNN**
**U.S. District Judge**